Secretary of State of Georgia. 22-12593. And it looks like we're going to have three folks arguing today. Mr. Petrani, you have reserved three minutes for rebuttal. You may proceed when you are ready. Thank you, Your Honor. May it please the Court. I'm going to take a moment to talk about the race-based injury which is necessary for Section 2, where all you have is partisan voting patterns. You can't make that inference. By contrast, plaintiffs view that the only thing that matters is whether the majority and the minority vote differently would mean that every single election where a minority-preferred candidate loses is racially polarized. And that would lead to Section 2 not being so much a guarantee of a level playing field but really a partisan and racial preference that in most cases, essentially all cases, will require proportionality, which we know the text disclaims, and would also be constitutionally problematic. In a case like here, where the voting patterns show a majority voting for Republicans but not differentiating among the race of candidates, all that you have is ordinary partisan politics. That was Justice White's insight in his concurrence in Jingles. That was the view of the Supreme Court in Whitcomb. Is that really this – is that kind of tie between race and political party unique to this context, though? Well, I'm not sure what you mean by the tie being unique, Your Honor, but I will say that in – just to use an example, and I think if one thing kind of shows how far astray the district court went here, it was in declaring that racial polarization in this case was somehow worse than the racial polarization in Jingles, and I think that that's really indefensible. If you look at page 59 of Jingles, the reason that by and large everyone in – all of the Justice in Jingles mostly voted for the same judgment but then disagreed in some separate opinions about some of the details was the voting there was so clearly race-based polarization, not just ordinary partisan politics. At page 59, it makes clear white voters were not voting for black Republicans. They weren't voting for black Democrats. They weren't voting for them in primary elections or general elections where they had a choice. They would always rank the black candidate last or second to last. To compare that to this case with Georgia Public Service Commission elections where all we really have is Republicans winning, Democrats losing, and the majority supporting candidates of different race at essentially identical rates, and we have also additional evidence that even outside of Public Service Commission elections, it's really partisanship, not race driving things. Based on your partisanship argument, so do we have tension between Jingles and Rucho? No, I don't think so. I don't think so at all, Your Honor. I think that our argument is that Section 2 does not try to be some sort of anti-partisanship device. So, I mean, what Rucho says is basically, well, there's no standard for figuring out how much is too much partisan gerrymandering or something like that. But Section 2, the whole point is can we find racial causation? Is the reason that this minority is unable to elect its preferred candidates because there is a majority that is determined to make sure that it doesn't, or is it just, again, as Justice White put in his concurrence, ordinary interest group politics? And again, I'll point back to Whitcomb, one of the two cases that the amendments in 1982 were specifically designed to codify, and that somewhat surprisingly, counsel on the other side has not even mentioned, Whitcomb addressed almost this exact issue. I mean, it looked at a situation where black voters, and the court noted they were, you know, poorer than voters outside of this particular area, were not electing their candidates. But that was not enough for vote dilution because, as the court said, well, poor white voters here that vote for Democrats are also not electing their candidates. And there's no, and there was no sense that somehow the majority was voting against black or black preferred candidates specifically as opposed to just voting for Republicans. What do you make of the evidence that black voter cohesion has increased since 2016, but black partisan affiliation with the Democratic Party has not? So I'll make two points on that, Your Honor. The first is the partisan affiliations kind of social science idea is kind of a rough proxy, but we're not, argument is not, you know, it's going to be a one-to-one relationship between partisan affiliation and voting. You're looking at kind of what, you know, what are the patterns of voting, or if they're always voting 90% one way, then you would see that as a partisan voting pattern. But also, two other, I should say three points, because two other points about this. One is, even, let's just assume, and I don't think there's really evidence to establish this, but let's just assume that the minority population is voting in some way along racial and race-based lines. The key point, and I think the district court missed this a number of times in a number of its statements, is that what matters for the injury is whether the majority is doing that, and this is where it's very important to note that this did not happen among the majority. When you say this, what do you mean? What's this? And so the idea that, you know, someone would jump to the conclusion, oh, this is somehow racial in nature, as opposed to, well, there was this big political event, and that sort of shook things up. But again, the most important point is that the white voters showed no difference, or if a difference, they kind of came down a little bit. And I think that if you look at this court's cases, if you look at Jingle's, if you look at most of the cases in the other circuits, for one thing, most of the cases in the other circuits just agree with us. And they make this point rather explicitly, especially the Fifth Circuit, Seventh Circuit. I think the First Circuit has a slightly different test, but at least makes the point that it can't just be partisan voting patterns. But where you look at cases like Marengo or Wright from recently in this court, and the court has accepted, you know, racially polarized voting, in every single case, it's because it was obviously race-based. So to use, you know, Wright as an example, these were nonpartisan elections where the white voters were not voting for black candidates. In Jingle's, as I already explained, it was very clearly white voters not voting for black, black-preferred candidates, regardless of party, general election, primary election, so on and so forth. And if you look through this court's cases, you'll see that pattern. And when you don't, what you see is that the court is not upholding Section 2 violations. So in Southern Christian Leadership Conference, for instance, the court said, well, the district court looked at this and found that these were not really race-based voting patterns. Good job. You know, therefore, there's no Section 2 violation. Do you think there's anything different about a statewide race? I know I didn't see any cases cited in either brief where Section 2 said that a statewide race had to be single district. Is there something different? You can't obviously adjust the lines of your state. Yes, absolutely. So this is our second and independent error that we think that the district court made, a second argument that we have. But absolutely, I think that, you know, in this case, we have a statewide quasi-judicial agency, basically. I mean, this is not a county legislative board or a school board or something like this. I mean, this is pretty close to the heart of a state's sovereign power. Now, we're not saying that in no case could you ever raise, you know, a vote dilution claim where you have a statewide election, but where it's very much part of the character of this agency that it be statewide, that it be elected statewide, because in large part, it has such a judicial function that you want not only no partiality, but no appearance of partiality as it addresses various different adjudications. You know, if you have an adjudication, this is not uncommon, where two power companies are trying to provide power for a particular site, and you have to decide, well, who actually gets to do that? You don't want it to look like, well, all of the, you know, all of the power companies are in this district or that district, and that's where they're going to vote, for their district, because that's who they're beholden to. You have a home cooking concern. Yes, exactly. Just as this Court has noted in Davis and Nipper and so forth. And we do think that— Well, let me ask you a question about that. So we've talked about, and you mentioned the quasi-judicial character, and you've cited to Nipper. It's also a quasi-legislative body. So what are we to make of the fact that it sort of has a foot in both worlds? Yes. I think saying it's quasi-legislative is not wrong. It might be a little overstated. I mean, really, everything it does is like a court, and it has a little more, I would say, policy discretion than your typical court might have. So when it's deciding a rate case or something like that, you know, it gets to bring its expertise and, to some extent, political views to bear. But I don't think that that fundamentally takes it out of the realm of Davis, Nipper, et cetera, especially when you look at the fact that it is statewide. It is a state agency. It's not just kind of, you know, a county or some political subdivision whose lines are inherently arbitrary and could be redrawn by the state at any moment or something like that. So we do. I mean, there's no doubt that, you know, Davis and Nipper were dealing with judicial elections per se, but there's also no doubt that Holder, Davis, et cetera, were not limiting it, this rule that you can't kind of change the fundamental character of government to any particular form. You know, it wasn't just, well, judicial elections or number of commissioners. It was the basic rule of you need to have something you can compare it to. I think there are more changes at issue in Nipper. If the federal courts could say here, PSC, you need single-member districts, could we also say that Court of Appeals, you need single-member districts too? And Georgia Supreme Court, you also need to get your justices from around the state? Yeah, I think that it's not obvious what the distinction between those things would be. I mean, this was the whole insight of Holder that this court, of course, reflected in its decisions, was there are certain times where comparators are apparent. If you have a single-member districting scheme, a Davis single-member districting scheme is a decent comparator, and where you have kind of a political subdivision that is itself somewhat arbitrarily drawn, you know, comparing an at-large system to a single-member district system might make sense. But here, where you're talking about the entire state, it's not obvious why this would be a relevant comparator, why you would look at, well, for governor, no one can complain because there's just one governor and it's statewide, but for a public service commission, we're going to kind of divvy things up and divide it into districts. I mean, we don't think that makes much sense. So you've noted that this would be fundamentally changing the form of government chosen by the state. You have argued that the elected by the people is a constitutional provision, and that means statewide. If, just assume, for the sake of argument, we disagree with you, that we find more that the statewide piece falls in a Georgia statute rather than the Georgia Constitution, how does that determination affect your argument? Yes, I don't think it actually does affect our argument very much, Your Honor. Our argument as to the constitutionality was really more that the district court seemed to believe this was important because it spent a page and a half explaining how this was not actually in the Constitution, and that seemed to undermine, in the district court's view, sort of the importance of this particular form. And so our point was just, to the extent the district court and to the extent this court believed that it really matters, whether it's constitutional or merely statutory, well, then you should certify. I mean, if it's a dispositive question, you should certify. But we believe that you don't actually need to get to that question because we think it being statutory is good enough. The General Assembly has declared this is how the form should be. There are good reasons for that. We want to avoid the appearance of partiality and so on and so forth. So ultimately, should not matter. Our point there was simply if the court thought that it mattered for some reason, then you should certify. I'll ask your friend on the other side the same thing, but I want to make sure I'm understanding the request. I've seen a lot of language about how I think District 3 would have a voting majority of black voters. Do you understand the goal to be creating one district that would be primed to elect a black voter's candidate of choice or two districts or three or, I mean, however many? So, I mean, to some extent, of course, it's really the plaintiffs who have to identify what they're asking for. But what I'm saying is that they are trying to create one single-member district that's majority-minority and that the other four would just be single-member districts but not majority-minority. Of course, they can correct me if they're looking for something else. Okay. And do you know if the state is planning to propose a new system in response to the district court's order during the upcoming legislative session? Well, sir, the reason that this case was expedited was basically, as I understand it, because the legislature needs to know, you know, does it need to do something? So if this court were to affirm the district court, then yes, I do think the legislature would take this up and try to figure out, okay, what do we need to do next? But obviously, if the court were to reverse, then the scheme would not necessarily require a legislative fixing. What happens if you don't have a ruling from this court before the legislature goes into session or gets out of session? You know, Your Honor, I can't speak for the legislature necessarily. I mean, my hope would be that they would look at it and maybe come up with some sort of a solution where, you know, it's contingent, you know, depending on what this court says or something like that. But, you know, it's hard enough to predict what the legislature is going to do when you're in the legislature. I can't do it from where I stand. Well, speaking of hard to predict, do you think that the Merrill decision for the Supreme Court is likely to have any impact on this case? You know, obviously, any Supreme Court decision can have an effect in the area, but I don't necessarily see how it would impact the two errors that we're pointing out. I think the Merrill decision, the argument seems to be mostly about, the question seems to be mostly about kind of what is a compact district and so on and so forth. Now, I can't control the Supreme Court of the United States either. And if they, you know, if they explain in more detail what they think, you know, racially polarized voting means, you know, if they go with more of Justice White's view, obviously that might affect our first argument. But I think that nothing in the briefing there or the decision there that I have seen is really tracking what the error of the district court here was, which was essentially mistaking, again, to use Justice White's terms, ordinary interest group politics for racial, you know, race-based voting. But you don't rule out the fact that the Supreme Court could give more guidance on Section 2 that could have broader applicability. I can't rule anything out, Your Honor. Thank you. And you have three minutes left. Mr. Sells, you have ten minutes. Thank you, Judge Branch, and good morning. May it please the Court, Brian Sells of Atlanta, on behalf of Richard Rose, Briante McCorkle, Wanda Mosley, and Reverend James Woodall. This Court should affirm the judgment of the district court because Judge Grimberg's ultimate finding of racial vote dilution is not clearly erroneous. It is more than adequately supported by substantial evidence in the record, and much of that evidence is either stipulated, admitted, conceded, or undisputed, or in some cases, all of the above. In making his findings a fact, moreover, Judge Grimberg stayed well within the lines of firmly established precedent. The case law on which he relied, including Thornburg v. Jingles and United States v. Marengo County Commission, has been well settled for decades. The Secretary obviously disagrees with settled law, and he invites this Court to rewrite it. That's something, of course, that this panel is without the power to do. But even if this Court were inclined to rewrite the law as the Secretary requests, this case would be a bad vehicle for doing that. Why? Because the evidence supporting the plaintiffs here is so strong, stronger, in fact, than the evidence in Jingles and stronger than the evidence in this Court's Sumter County case from two years ago. The Secretary's case, by contrast, is both light on facts and undercut by adverse credibility determination. Are you aware of any case where Section 2 renders a statewide election illegal? So I think the answer is no, but what's the universe, right? I mean, there are 50 states, right? But how many have statewide multi-member bodies? Probably many of them have statewide multi-member courts, for instance. So there are, putting courts to the side, there are, according to the record, seven states that use, including Georgia, that use at-large elections for some or all of their utility regulators. And I happen to know that there are two states, Colorado and Michigan, that use at-large elections for some or all of their boards of educations, and one state, Hawaii, that uses at-large elections for a Native Hawaiian board. But the universe that we're talking about is fairly small, and very few of those boards are in the South or in places with histories of racial discrimination. There have been, I think, unsuccessful cases related to the state court system. So I don't know that it's quite fair to set those aside since it's the same model, even though it's a different subject matter. Well, I respectfully disagree. This Court's opinions on judicial elections treat judicial bodies very differently than collegial bodies like the Public Service Commission. Even though the Public Service Commission is aptly characterized as quasi-judicial? Yes, Your Honor. First of all, the Georgia Supreme Court has characterized the Public Service Commission as an administrative body that has both quasi-judicial functions and quasi-legislative functions. There are several reasons why that should not be a determinative here. First is because they are a collegial body, and Judge Joe Flatt's opinion in NIPPER really draws that line quite clearly. But second, there's no limiting principle between the Public Service Commission and, let's say, a county commission or a county board of education. But textually speaking, regardless of what our precedents say, which of course we'll take into account at the time, but for purposes of these questions, I don't quite understand why there would be a distinction between a judicial body and an administrative or legislative one. Because certainly, if there were evidence that a state designed its court system in a way that was meant to depress the ability of black voters to elect their preferred candidate, I don't think you would say that the Voting Rights Act doesn't apply, would you? I would say that under this Court's decision in NIPPER, all the way down the line... I'm not talking about this Court's decision. I'm talking about based on the statute and what the Supreme Court of the United States has said. The Supreme Court of the United States and the statute has carved out no exception. That's the Houston Lawyers Association case, right? But this Court's decisions in the judicial cases have drawn a distinction and has made it impossible to bring cases against judicial bodies. As the Court recognized in Childs v. Davis, there might be some tension there with Houston Lawyers Association, but that's the law that this panel is bound by in this circuit. Help me understand, too. I do want to make sure I understand. You are arguing that there should be one majority and minority district, right? We haven't had the remedy phase of the case yet, Your Honor, and what evidence might come forward from that, I can't say. We've had another election since trial that may have some bearing on the... When you say your filings at least are suggestive of the fact that you would be satisfied with one majority and minority district, am I wrong about that? Yes, I think you are. We satisfied Jingles 1 based on the 2010 census, which showed that it was possible to draw one majority and minority district. Right, so that's what I'm referring to. It was possible to draw two. So have you, just so you haven't made any... What I saw mostly in the briefings was discussion of the fact that District 3, I think, could be a successful majority and minority district. You're correct. Okay, but you haven't made arguments yet. I understand that you might if you have the chance, but you haven't made arguments yet for two, right? That's not correct. There is evidence in the record. We put in a two-district plan in the record. It wasn't necessary for the court to address that at all because we satisfied Jingles 1 even before the 2020 census came out. I guess the reason I was curious is that now there is, of course, a black member on the commission, and to the extent that your argument, I think, says that black voters will not want to elect Democrats. They will want to elect other black citizens, and I'm not sure why you would... To the extent you only asked for one, I'm not sure why you don't already have what you're seeking. Well... Because if race and party are not the same, then it seems like you've already gotten a long ways towards what you were originally asking for. I think that's not correct, Your Honor, and courts have rejected racial essentialism since Jingles and even in Jingles. It doesn't matter the race of the candidate that's elected. Black voters in Georgia have the legal right to elect candidates of their choice, whether those candidates are black or white. I mean, I agree. Don't get me wrong. I agree entirely with that. I'm just not sure that I've seen the type of evidence that we see in other cases where that denial has been found, where race and party are so tied up here. Well, I disagree, Your Honor. The evidence here is stronger, much stronger, than the Wright v. Sumter County case on which you voted in the majority just two years ago. In Wright v. Sumter County, we didn't have a uniform pattern of racial polarization and defeat of the black preferred candidate. We had a usual defeat. We satisfied the third Jingles factor there, but we didn't have the clearest pattern of racial polarization that our expert has ever seen in, you know, after having analyzed thousands and thousands of elections. In Wright v. Sumter County, there was a dispute over Jingles 1. There was not a dispute over Jingles 2, but there was also a dispute over a number of the Senate factors in Wright v. Sumter County. There's much, much less dispute here. Why? Because the evidence is stronger. It is much stronger. I disagree with Mr. Petrani. It's much stronger than was available in Jingles, and you can see that from the record because in Jingles, there was a lot more white crossover vote than we have today in Georgia. Let me ask you about the remedy as well. So here we have a statewide election, and your remedy would push this election into various districts. This goes beyond redrawing district lines. This is going from statewide to a smaller district. How is this not impermissibly forcing a new form of government on the state of Georgia, which has decided, whether it's through statute or constitution, that it wants to hold statewide elections for the Public Service Commission? Well, I have several points to make in response to that. First, it's not qualitatively different than the state statute at issue in Wright v. Sumter County. That was also a state statute that decided how Sumter County should elect its Board of Education. Same body adopted those two statutes that we're talking about. But nobody here argues that there would cease to be a Public Service Commission if commissioners were elected by district rather than statewide. A commission is a body that is charged with certain public functions. That's all it is, and that's what it would remain if it were elected by the district rather than at large. But you've certainly not cited any evidence that the statewide nature of the election – I understand, of course, that intent is not necessary, but you've not even suggested that there is any intent in the decision to make these seats statewide, have you? We did not bring an intent claim. I think that the fact that the at-large nature was adopted in 1906 at the time when black voters were being disfranchised in Georgia is suggestive of intent, but we didn't raise that claim. We didn't need to raise that claim because the results evidence is so strong. What do you make of the fact that voting patterns do not change when the race of the candidate changes? Well, I disagree with that, but again, as a matter of fact, I disagree with that. And Mr. Petrani overlooks the fact that there aren't any black candidates for Public Service Commission. What there is in the record, however, is evidence that there were 11 black candidates in Republican primaries in 2022 alone, and the only one who succeeded was Hershel Walker. That is suggestive that the race of the candidate matters quite a bit for the majority of white voters who vote for Republican candidates. You've exceeded your time. Thank you. Thank you. I ask the Court to affirm the District Court's judgment because it is not clearly erroneous. Mr. Bakker, you have five minutes. Thank you, Your Honors. May it please the Court, Jonathan Bakker for the United States. Section 2 of the VRA prohibits electoral devices that have the effect of diluting minority voters' political power in jurisdictions where race plays an outsized role in the political process. The Supreme Court in Thornburg v. Jingles adopted a detailed test specifically targeted at identifying when those conditions are present. The Jingles test limits Section 2 liability in vote dilution cases to instances where voters are polarized along racial lines, meaning that minority and non-minority voters vote differently. This Court in Marengo County recognized that such evidence is the surest indication of what it called race-conscious politics. But proving the Jingles preconditions, including the presence of racially polarized voting, is not sufficient to establish a Section 2 violation. Under Jingles, a plaintiff must also establish that the totality of the circumstances supports a finding of vote dilution by marshalling additional anecdotal evidence confirming the presence of race-conscious politics. The Secretary impermissibly urges this Court to adopt an entirely different framework that would allow defendants to escape Section 2 liability merely by asserting that racially polarized voting patterns correspond with partisan voting patterns. Does your argument depend at all on the fact that there are residency requirements? I think the residency districts are important to the remedy question. No, not to the remedy, to the merits argument. No, I don't think they make a big difference to the partisanship issue. So if the state, rather than choosing to at least protect its asserted interest in making sure that essentially the Public Service Commission was not made up of Atlanta residents, if the state had not chosen to designate those districts for people to live in, would you still have a Section 2 argument? I'm not sure I understand the question. I mean, the basic point is I'm not aware of any statewide case, statewide election case, that has been a problem under Section 2. And I think it, of course you could, I think if, although intent is not required, I think it's obvious that the VRA applies to statewide elections. If there were intent, I think that would be an obvious case of a problem. But it just seems to me that it's much more challenging to show that there's vote dilution in a state where there's no way to adjust the state lines to create a different result or anything like that. And I suspect that's one reason that we haven't seen any cases with a VRA violation for a statewide race. I think Mr. Sell spoke to the limited universe that's available for non-judicial elections, non-judicial offices that are elected on a statewide basis. And I think that's why you don't see. But is there, I mean, I know the 11th Circuit has precedent, but is there any, is there any Supreme Court precedent or anything in the law that would keep the VRA from applying to judicial elections? I don't see why it shouldn't apply, frankly. And the Appeasing Lawyers Association expressly says that it does apply. So I don't think that you can remove judicial elections from the question when you're, I think obviously if we had that case, we would be bound to say that it couldn't apply to judicial elections. But I don't see any reason why those same principles wouldn't apply. I want to separate the issue of remedy, which I think your question goes to, Your Honor, from the overall question of what is the role of partisanship. And the Jingles Test is completely focused on the question of whether there is race-conscious politics. You have the totality of the circumstance. You have the preconditions, which focuses on racially polarized voting. And this Court has said that that's the surest indication of race-conscious politics. But then you have the totality of the circumstances. All of the Senate's factors are focused on the question of whether there is race-conscious politics. Isn't it just harder to show? I mean, I'm really asking, is it harder to show race-conscious politics when you have a state line? Because, for instance, if these five districts were single-member districts and they were drawn in a way that there was no majority or minority district, or even maybe that there was one, right, that would be quite obviously, I think you could probably pretty easily establish, especially if there were no majority or minority districts, you could pretty easily establish that there were racial things going on there. Isn't it a little bit harder on a statewide basis? I don't think that it is harder on a statewide basis, Your Honor, because the same analysis applies. You're still looking at the preconditions to see if, in the usual case, minority voters are unable to exercise political power because of racially polarized voting. And then in the totality, you're looking at the history of official discrimination in the jurisdiction. You're looking at whether there are current disparities in socioeconomics and education that reduce lower turnout or reduce campaign donations from minority voters. You're looking at whether there are racial appeals. You're looking at whether there are other devices besides the ones challenged that make it harder for minorities to exercise political power. None of that is tethered to whether or not you're looking at a single-member district or statewide. And I'd add that, you know, cases like Wright, which Your Honor sat on, that that is a county-wide, two at-large districts there. So you're still trying to look at the electorate as a whole in that jurisdiction. There have been some changes, right? There have been some shifts that had a particular effect on the number of black-preferred candidates who won their races. Right. But, Your Honor, the analysis is still the same. It's all about trying to see whether there is race-conscious policy because what Jingle said is the essence of a Section 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions. That's the race-conscious politics part. To cause inequality in the opportunities enjoyed by black and white voters to elect their preferred candidates. So it's about the causation here. The Secretary is really talking about looking for animus in the electorate. And that's not what Jingles requires. That's not what Section 2 requires. It's about looking at whether there is racially polarized voting combined with social and historical conditions, the presence of race-conscious politics that makes it impossible for minority voters to exercise equal political power in a jurisdiction. And it makes no difference whether you're looking at a statewide election or a countywide election or some other political subdivision in making that analysis. What about the fact that even since the briefs were filed in this case, we have further evidence of the fact that black voters are, in fact, able to elect their preferred candidates statewide? We have Senator Warnock who has been elected again. And that was a race between, you know, Hershel Walker and Senator Warnock. We had Stacey Abrams who, again, was selected by the Democratic Party to be the statewide representative. I understand she didn't win, but there could be an argument, of course, that Georgia is a majority Republican state. How do we look to the more recent successes? Well, Your Honor, I think that does come into the totality of the circumstances, and it did in this case. Judge Grimberg did consider that evidence, obviously not the most recent evidence, but the fact that there were two black candidates for Senate. But again, that's an exogenous election, and this court's decision in Wright makes clear that exogenous elections are less probative. And if you look squarely at PSC elections, the fact is that this is the clearest evidence of racially polarized voting that Dr. Popik has ever seen in analyzing hundreds of cases like this. And then also that over the 143-year history of this body, only one black candidate has ever been elected to the office. That was 20 years ago, and that person was an incumbent because he had been appointed to the office before he ran for re-election. But Judge Grimberg rejected the fact that we have gubernatorial appointments as weighing in favor of the plaintiffs. Sure, he did have a slating factor of the Senate factors, but he didn't reject the issue entirely in looking at the totality of the circumstances. So I would just say that those two factors that I just pointed out, which are the ones that this court said are the two most important for analyzing the totality of the circumstances, those point clearly toward the presence of race-conscious politics here. And the Secretary has not put in any evidence that actually disentangles partisanship from race in a way that you could say that what appears to be racially polarized voting actually is something else or some other variable lurking that explains the voting patterns here. So from that alone, Marengo County says that that's the surest indication of race-conscious politics. And so there is something present in PSC elections that prevent minority voters from exercising equal political influence in these elections. Thank you, Your Honor. Thank you. Mr. Petrani, you have three minutes remaining. I'll try to get to a few points, Your Honor. The first is I entirely agree with the government that the point of the jingles prerequisites is to identify race-based injury, race-conscious politics. And when the court said that in Marengo, that's the point. In Marengo, as elsewhere, it was because you had patterns of white voters voting for white candidates, not black candidates. And it was very clear this was race-based voting. This is the whole point. If you're looking for race-conscious politics, finding out that Republicans vote for Republicans and Democrats vote against Republicans is not telling you anything. So I think the entire idea that somehow any jurisdiction where you see partisan polarization is essentially going to be redone under Section 2. And this is the government's test, page 15 of their brief, their second example. They admit if black voters are voting for Democrats and Democrats lose, you have to create a district for Democrats. That is not what Section 2 does. And I would go to something that counsel for plaintiffs said, which was that minorities have the legal right to elect candidates of their choice. No, they have the legal right to have the same opportunity to elect candidates of their choice as everyone else. When black, Asian, Hispanic, and white Democrats are all losing for the same reason, they're all voting for Democrats and Democrats are all losing, everyone has the same political opportunity. And then this idea that settled law is somehow against us, settled law is all on our side. We have cited numerous cases that have identified that where there is a partisan explanation for voting patterns, you can't find Section 2 liability. They have identified not one where a court went the other way on that question. What's your response to the argument from the expert that this was the worst case he's ever seen? That expert was defining racially polarized voting entirely in terms of who votes for whom. No race-based question at all. Just, well, 80% of the majority here votes one way and 80% of the minority here votes the other way. That was my point about the district court's error in comparing this unfavorably to jingles. It cannot possibly be that jurisdictions where white voters are switching who they're voting for based on the race of the candidate is somehow less racially polarized than this case. And I think that that goes throughout their entire case. They're expert and their arguments the entire time where we don't need to explain why partisanship seems to be the thing that really drives elections for a public service commission. And that was legal error. And then finally, the counsel for plaintiffs briefly mentioned this one anecdotal offhand comment by one of the plaintiffs' witnesses who said, well, yeah, I think there were 11 Republican primaries and only one with a black candidate and only one black candidate won. First of all, even assuming those numbers are correct, and there's nothing in the record to say they are, those were contested. So, for instance, the Republican candidate in the public service commission also would have been black if the election had not been canceled, as would his opponent have been. So, that is not serious evidence of any kind. It was not investigated. No one did any sort of statistical analysis or looked at it. But I would just end with the point of Section 2, and we actually agree at the top level with the United States on this, is to find elections where race is dominating politics and keeping minority voters on account of race from being able to exercise political opportunity. The reason the district court thought that was going on here was because it did not understand racially polarized voting, and it thought that all it needed to look at was, as the rejected plurality opinion in Jingle said, just who votes for whom, and we don't go beyond that. That is not what courts have said. It doesn't make any sense because just saying there's one-side votes for, you know, Republicans and one-side votes for Democrats doesn't indicate in any particularly strong way race-conscious politics. And Georgia Public Service Commission elections follow the pattern generally in Georgia. Republicans tend to win. That is not evidence of invidious racial discrimination. Thank you, Your Honors. Thank you. We have your case under advisement, and we are going to take a brief break. We will be in recess for 10 minutes.